Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/14/2017 09:11 AM CDT

State of Nebraska, appellee, v.
Akeem R. Jones, appellant.
___ N.W.2d ___

Filed April 21, 2017.    No. S-16-754.

1. **Criminal Law: Convictions: Evidence: Appeal and Error.** When
   reviewing a criminal conviction for sufficiency of the evidence to
   sustain the conviction, the relevant question for an appellate court is
   whether, after viewing the evidence in the light most favorable to the
   prosecution, any rational trier of fact could have found the essential ele-
   ments of the crime beyond a reasonable doubt.
2. **Evidence: Appeal and Error.** An appellate court does not resolve con-
   flicts in the evidence, pass on the credibility of witnesses, determine the
   plausibility of explanations, or reweigh the evidence; such matters are
   for the finder of fact.

Appeal from the District Court for Douglas County: Leigh
Ann Retelsdorf, Judge. Affirmed.

Jerry M. Hug, of Alan G. Stoler, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E.
Duffy for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy,
Kelch, and Funke, JJ.

Stacy, J.
Akeem R. Jones was convicted of first degree murder and
was sentenced to life imprisonment. This is his direct appeal.
His sole assignment of error is that there was insufficient evi-
dence to support the conviction. We affirm.

## FACTS

On March 11, 2009, Gary Holmes was shot and killed inside BJ's, a convenience store near 42d Street and Ames Avenue in Omaha, Nebraska. The shooter was wearing a black, hooded sweatshirt and a ski mask. The shooter did not enter BJ's, but instead opened the front door to the store and fired 15 shots. Nine or ten of them hit Holmes, and several hit and severely injured another customer. The shooting occurred at approximately 2 p.m., and officers arrived at the scene almost immediately. The incident was recorded on surveillance tape and observed by several witnesses.

### Dontia Bullard

After arriving at the scene, police made contact with Dontia Bullard. Bullard lived in an apartment he described as being "about 20 seconds away" from BJ's. Bullard, his girlfriend, and his infant son were getting out of a cab in front of the apartment when he saw two people in a red car parked in a nearby alley. A young man dressed in black got out of the car, cut through the backyard of Bullard's neighbor, and walked toward BJ's. Bullard worked at BJ's and recognized the man as a regular customer he knew as "Grimey." Other witnesses testified that Grimey was Jones' nickname.

Bullard testified that by the time he got to his apartment door, he heard approximately 15 gunshots. He sent his girlfriend and child inside and stayed by the door. From his doorway, he saw Jones come back through the neighbor's yard and return to the red car, carrying a ski mask and a gun. Bullard admitted on cross-examination that he had contact with police within minutes of the shooting and was questioned within hours of the shooting, but did not immediately tell them about what he saw. A few days afterward, however, Bullard contacted police and gave a statement. He explained that initially, he did not want to be involved, but decided to come forward because Holmes had been a friend. He admitted on cross-examination that he had been at BJ's almost every

day since the shooting and had talked about the shooting with people there.

## TYSHEONNA ANTHONY

Tysheonna Anthony also testified at trial. On March 11, 2009, she was living in Omaha with Jones' mother and was friends with Jones. On the day of the shooting, Anthony, Jones, Jamie Romaine Pace, and another man were driving around in a tan Cadillac owned by Pace. They stopped at BJ's sometime in the late morning so that Anthony could purchase a cigar, which she intended to use to smoke marijuana. Anthony entered the store while the others remained in the car. As she was leaving the store, Anthony saw two men approaching. One was wearing a black baseball cap with a "P" on it. These men were later identified as Holmes and Rodney Smith. Anthony got back in the car, and the foursome continued driving around.

They returned to BJ's a few hours later so Anthony could purchase another cigar. Again, Anthony entered the store alone, and the others remained in the car. Anthony testified that while she was in the store, Holmes and Smith were "mugging" her, which meant they were "staring [her] down." She thought they were also staring down the others in the car. When Anthony returned to the car, Jones was angry and starting asking about the guy in the "P" hat. Jones then asked if the others wanted to "earn their stripes" by going into the store and shooting the two men.

Anthony testified that none of the other occupants wanted to get involved, so they left BJ's. A few minutes later, however, they met Maxwell Griffey and his girlfriend Syerra Chatmon in an alley near BJ's. Griffey and Chatmon were driving a red Ford Focus. Jones was still angry and "going off," and he got out of the Cadillac and started talking to Griffey. Anthony could not hear the conversation, but she described Jones' demeanor as "pissed," explaining she could "see in his face that he's pretty mad." Anthony saw Jones change clothes with

Griffey in the alley, after which Jones got into the red car with Griffey. Chatmon got out of the red car and into the Cadillac with Anthony and the others, and Jones told Anthony to leave and go to his mother's apartment. Anthony testified she knew Jones had a ski mask and a gun with him, because she had seen them when he was still in the Cadillac.

The Cadillac and its occupants then left the alley, and drove to an apartment complex on 48th Street, where Jones' mother lived. According to Anthony, Griffey and Jones arrived at the apartment approximately 5 minutes later in the red car. At least Jones, Griffey, and Anthony went inside the apartment, and while there, Jones and Anthony went into the bathroom. Jones then told Anthony he had returned to BJ's, opened the front door, and "start[ed] shooting." He described shooting two men, and showed her the 9-mm gun he used. He then took off his clothes, sprayed them with something, lit them on fire, and tossed them out the bathroom window. Anthony testified she did not contact police because Jones told her if the police found out what had happened, he would "know it came from us" and he would "shoot all of us."

Griffey was killed in July 2009. Police contacted Anthony while investigating that homicide, and also asked her about the March 2009 shooting at BJ's. At that time, Anthony told investigators about Jones' involvement. By the time of trial, Anthony was incarcerated and serving a sentence for two felony convictions.

### Jamie Romaine Pace

Pace's trial testimony was similar to Anthony's. However, according to Pace, after the second trip to BJ's, she drove her tan Cadillac directly to the apartment complex on 48th Street, where they were met by the red car occupied by Griffey and Chatmon. Pace also recalled that Anthony got into the red car with Jones and Griffey. Pace thought Jones appeared upset and warned Anthony not to get involved. Pace testified that she randomly encountered Jones at a store sometime

after the shooting and he told her he was worried Anthony would talk.

### SYERRA CHATMON

Chatmon also testified. She, like Anthony, recalled the meeting of the two cars occurring in the alley near BJ's. Chatmon stated that she got in the tan car originally occupied by Jones, Anthony, and Pace while Jones got into the red car she had arrived in with Griffey. Chatmon stated the tan car then went to the apartment complex on 48th Street, and Griffey and Jones arrived approximately 20 minutes later.

### EVIDENCE OF FIRE

A man who lived at the 48th Street apartment complex testified that sometime in March 2009, he noticed a fire near a dumpster and attempted to put it out. The fire consisted of clothes or rags on top of a mattress or box spring. Fire department records show a unit was dispatched to the 48th Street apartment complex at 2:25 p.m. on March 11 and found a smoldering mattress near a dumpster.

### CHRISTOPHER CODDINGTON

Jones did not testify at trial. The sole witness called on his behalf was Christopher Coddington. Coddington was sitting in the driver's side back seat of a car parked in front of BJ's at the time of the shooting. He testified that the shooter was wearing a black hoodie. Coddington got out of the car and tried to follow the shooter as he or she ran around the outside corner of the store. Coddington thought he saw the shooter running toward 42d Street, in a northwesterly direction. The record indicates that the red car Bullard saw Jones exit and return to was located near 41st Street, east of BJ's.

The jury returned a verdict of guilty, and the district court sentenced Jones to life imprisonment. He filed this timely direct appeal.

## ASSIGNMENT OF ERROR

Jones' sole assignment of error is that there was insufficient evidence to support the verdict.

## STANDARD OF REVIEW

[1] When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[1]

## ANALYSIS

A person commits murder in the first degree if he or she kills another purposely and with deliberate and premeditated malice.[2] Jones argues there was insufficient evidence to convict him, because the identity of the shooter was not established beyond a reasonable doubt. Jones does not contest the sufficiency of the evidence related to the other elements of the crime.

Jones argues that although both Bullard and Anthony identified Jones as the shooter, the "bulk"[3] of their testimony was not corroborated. He further asserts that other evidence contradicted the testimony of Bullard and Anthony. In essence, Jones asks this court to reweigh the evidence adduced at trial.

[2] But that is not the role of an appellate court. An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or reweigh the evidence; such matters are for the finder of fact.[4] The relevant question for an appellate

---

[1] *State v. Olbricht*, 294 Neb. 974, 885 N.W.2d 699 (2016).

[2] Neb. Rev. Stat. § 28-303(1) (Reissue 2016).

[3] Brief for appellant at 10.

[4] See *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017).

court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[5]

Here, Jones challenges only the sufficiency of the evidence to identify him as the shooter. As such, the question before us is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that Jones was the shooter.[6] We conclude it could.

Anthony testified that Jones was upset prior to the shooting, proposed the shooting, possessed a ski mask and a gun prior to the shooting, and confessed to the shooting after it occurred. Bullard testified that he saw Jones walking toward BJ's and soon thereafter heard gunshots. He then saw Jones returning to the red car carrying a gun and a ski mask. This evidence, if believed by a trier of fact, was sufficient to establish Jones' identity as the shooter beyond a reasonable doubt. Jones' argument to the contrary is without merit.

## CONCLUSION

For the foregoing reasons, we affirm Jones' conviction and sentence.

Affirmed.

---

[5] *Id.*; *State v. Olbricht, supra* note 1.

[6] *Id.*