IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. SCHADEMANN


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

JARED SCHADEMAN, APPELLANT.


Filed February 12, 2019.    No. A-18-359.


Appeal from the District Court for Douglas County, MARLON A. POLK, Judge, on appeal thereto from the County Court for Douglas County, SHERYL M. LOHAUS, Judge. Judgment of District Court affirmed.

Thomas C. Riley, Douglas County Public Defender, and Natalie M. Andrews for appellant.

No appearance for appellee.


RIEDMANN, BISHOP, and WELCH, Judges.

WELCH, Judge.

## INTRODUCTION

Jared Schademann appeals his conviction for disturbing the peace. Schademann sought out the victim at her boutique, made an unwelcome pitch to her about joining him in a business venture unrelated to her boutique, asked her personal questions, and revealed personal details he knew about her and her family. He contends that his speech was protected under the First Amendment and that not allowing him to cross-examine the victim about the public availability of the personal information he learned about the victim and shared with her was reversible error. We affirm.

## STATEMENT OF FACTS

In early January 2017, the victim was working at her boutique clothing store and encountered Schademann speaking with her employees. She recognized him because, on a

- 1 -

previous occasion, Schademann had come into the boutique, talked a lot about real estate, how he had a lot of money, asked if he could get a discount for buying 100 gift cards, and stayed more than 30 minutes past the store's closing time. During the January 2017 encounter, due to his disruption of her employees, the victim came out of her back office and approached Schademann in order to protect her employees. After approaching Schademann, the victim testified that Schademann began to speak to her about property that he owned and developments he was doing. He told the victim that he wanted her to help decorate new developments and told her that she had a beautiful apartment despite the fact that the victim had no preexisting relationship with Schademann. She testified that Schademann told her she would get a blank check to decorate for him and then he would list the properties on Airbnb, which is an online lodging reservation website where users can rent, rate, and review properties from property owners for short-term lodging in locations worldwide. When the victim tried to end the conversation, Schademann asked her questions that became more personal. He provided the victim with a property address he claimed he wanted to buy which was the address of her ex-husband's home, Schademann referred to her ex-husband by name, and asked if the individual was her ex-husband. He then referred to the victim's daughter by name and asked if the victim's daughter lived with the victim's ex-husband at the address.

The victim found the display of personal knowledge about her to be threatening, alarming, and scary. She tried to be curt but professional in getting Schademann to leave the boutique, but he would not oblige. She testified that the more she tried to end the conversation and get him to leave, the more personal his questions became. After multiple attempts to end the conversation, the victim finally demanded that Schademann leave telling him "You have to go." The victim testified that Schademann did not appear happy to leave, he seemed "manic" and "erratic," "was pointing at [her] with a finger" and "getting really close" to her. The victim testified that she did not have a preexisting personal relationship with Schademann, had not told him who she had been married to, where she lived, or that she had a daughter.

After Schademann left the boutique, the victim locked the door, and called the police. A short time later, Schademann returned but, when he could not gain access to the boutique because of the locked door, he stomped off to his car. Following Schademann's departure, the police arrived and explained to the victim that she should draw up a "ban and bar" notice and serve it upon Schademann. The victim testified that both she and her employees were extremely upset following these incidents.

Schademann returned that evening near closing time claiming he wanted to retrieve some tampons he had donated earlier that day to a charity drive hosted by the victim's boutique. The victim tried to give Schademann the "ban and bar" she had prepared, but he refused to take it. The victim called 911 and followed Schademann out of the store, crying and attempting to give him the "ban and bar" notice, believing that for it to be in effective, he needed to take it. The victim told Schademann she did not want him to come back and to take the "ban and bar," to which he responded that "It's a free country I'll do what I want" and continued ranting at the victim. Police eventually found Schademann and the victim about six blocks away from the boutique, and arrested Schademann. Officer Robert Dellutri, one of the officers who responded to the call, observed the victim with tears in her eyes and at a loss for words. Dellutri testified that, during his interactions with Schademann, Schademann stated that "he was able to buy the whole block" and

that "he knew where . . . she [the victim] lives." He further testified that Schademann made comments about the victim's children, finances, and the victim's ex-husband during the course of the arrest.

Schademann was charged with three counts of disturbing the peace. See Neb. Rev. Stat. § 28-1322 (Reissue 2016). A bench trial was held in July 2017 in the Douglas County Court. During the trial, Schademann's counsel attempted to inquire about the victim's use of social media as it related to the source of Schademann's knowledge of the victim's personal matters. The victim's counsel objected to the question on the basis of relevancy which objection was sustained. In his offer of proof, Schademann claimed that the victim's social media accounts would explain how someone could discover the information that he learned about the victim before talking to her.

Schademann did not present any evidence in his defense. Instead, he argued that the facts presented by the State were not a violation of § 28-1322 and that his conduct was protected under the Free Speech Clause of the First Amendment to the U.S. Constitution. The county court found Schademann guilty of all three counts of disturbing the peace and sentenced him to 2 years' probation on count one and $100 fines for counts two and three.

Schademann appealed to the Douglas County District Court which overturned his convictions on counts two and three. The district court further found that the sentence of 2 years' probation on count one was excessive and reduced the term to 1 year of probation. The district court also found that the county court erred in not allowing Schademann to cross-examine the victim regarding her social media use, but that the error was not prejudicial. Schademann appeals to this court represented by the same counsel as represented him in the county court and the district court.

## ASSIGNMENTS OF ERROR

Schademann contends that the offense for which he was convicted is protected by the Free Speech Clause of the First Amendment to the U.S. Constitution. He also contends that the district court committed reversible error in finding harmless error from the county court's refusal to allow him to cross-examine the victim about personal information she published on her social media accounts.

## STANDARD OF REVIEW

Whether speech that leads to a criminal conviction is protected by the First Amendment is a question of law. *State v. Drahota*, 280 Neb. 627, 788 N.W.2d 796 (2010).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Tucker*, 301 Neb. 856, 920 N.W.2d 680 (2018); *State v. Wells*, 300 Neb. 296, 912 N.W.2d 896 (2018). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Tucker, supra*; *State v. Wells, supra*.

When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, we review the admissibility of evidence for an abuse of discretion.

*State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015). A trial court exercises its discretion in determining whether evidence is relevant and whether its prejudicial effect substantially outweighs its probative value. *Id*.

ANALYSIS

FREE SPEECH

At issue here is Schademann's remaining conviction for one count of disturbing the peace in violation of § 28-1322. Schademann first assigns as error and argues that the evidence presented at trial lacks the probative value to sustain a guilty verdict of the offense of disturbing the peace because his conduct here was protected speech under the First Amendment.

Section 28-1322 states that "[a]ny person who shall intentionally disturb the peace and quiet of any person, family, or neighborhood commits the offense of disturbing the peace." The Nebraska Supreme Court defined the offense of disturbing the peace in *State v. Broadstone*, 233 Neb. 595, 447 N.W.2d 30 (1989). In doing so, it held:

> In *State v. Coomes*, 170 Neb. 298, 301-02, 102 N.W.2d 454, 457 (1960), we said:
>
> "A breach of the peace is a violation of public order. It is the same as disturbing the peace. The definition of breach of the peace is broad enough to include the offense of disturbing the peace; it signifies the offense of disturbing the public peace or tranquility enjoyed by the citizens of a community. [Citations omitted.]
>
> "Breach of the peace is a common law offense. The term 'breach of the peace' is generic and includes all violations of public peace, order, decorum, or acts tending to the disturbance thereof."
>
> In *State v. Sukovaty*, 178 Neb. 779, 135 N.W.2d 467 (1965), the defendant was charged with disturbing the peace by publicly cursing, swearing, and using profane, obscene, indecent, abusive, and offensive language against the complaining witness. The evidence showed that the defendant failed to leave after being requested to do so and used profane and abusive language against the complaining witness and disturbed his peace and quiet by disorderly conduct. In affirming the conviction, we approved a definition of disorderly conduct as any act which tends to breach the peace or disturb those who see or hear it, and a definition of peace, as used in this phrase, as the tranquility enjoyed by members of a community where good order reigns.

*State v. Broadstone*, 233 Neb. at 599-600, 447 N.W.2d at 33-34.

*Broadstone* involved a defendant who was convicted of disturbing the peace for using foul language and banging a stick against a pole within the hearing distance of children who were leaving school and walking by his location. In *Broadstone*, as here, the defendant argued that the incident involved language which was protected speech under his right to freedom of speech under the 1st and 14th Amendments to the U.S. Constitution. In rejecting that argument, the Nebraska Supreme Court stated:

> *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942), defines language that tends to incite assault or other immediate breach of the peace as "fighting" words, which are not constitutionally protected forms of speech. In the *Chaplinsky* case the Court said at 571-72: "There are certain well-defined and narrowly limited classes of

- 4 -

speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words--those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' *Cantwell v. Connecticut*, 310 U.S. 296, 309-310."

In *Cantwell v. Connecticut*, 310 U.S. 296, 308-10, 60 S. Ct. 900, 84 L. Ed. 1213 (1940), the Court said:

"The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. . . .

. . . .

". . . One may, however, be guilty of the offense if he commit acts or make statements likely to provoke violence and disturbance of good order, even though no such eventuality be intended. Decisions to this effect are many, but examination discloses that, in practically all, the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument."

*State v. Broadstone*, 233 Neb. at 600-01, 447 N.W.2d at 34.

Schademann notes that the Nebraska Supreme Court clarified its holding in *Broadstone* in *State v. Drahota*, 280 Neb. 627, 788 N.W.2d 796 (2010). Schademann argues that, in *Drahota*, the Nebraska Supreme Court indicated that the U.S. Supreme Court appeared to retreat from the "inflict injury" portion of the definition of "fighting words" whose use can result in criminal punishment. Schademann cites and argues the Nebraska Supreme Court's holding in *Drahota*, that is: "We hold that the State cannot constitutionally criminalize speech under § 28-1322 solely because it inflicts emotional injury, annoys, offends, or angers another person." 280 Neb. at 635-36, 788 N.W.2d at 803. Instead, "'[i]t is the *tendency* or *likelihood* of the words to provoke violent reaction that is the touchstone of the *Chaplinsky* test . . . .' And both the content and the context of the speech are relevant considerations to that determination." *State v. Drahota*, 280 Neb. at 636, 788 N.W.2d at 803, quoting *Lamar v. Banks*, 684 F.2d 714 (11th Cir. 1982) (emphasis in original). "To fall within the First Amendment exception for fighting words, speech must be 'shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.'" *State v. Drahota*, 280 Neb. at 635, 788 N.W.2d at 802, quoting *Terminiello v. Chicago*, 337 U.S. 1, 69 S. Ct. 894, 93 L. Ed. 1131 (1949).

In sum, Schademann argues that none of the words he used are "fighting words" as that phrase has come to be defined and that the words he used can only be described as information

relating to the victim which he learned from public sources which is constitutionally protected speech for which he cannot be criminally prosecuted. However, we need not decide whether Schademann's words constitute "fighting words." Schademann was not convicted solely because he provided the victim with personal information he learned from public sources which intimated her, threatened her, alarmed her, and scared her. It was the language he used, designed to reveal his knowledge of her personal matters that resulted in the victim's reaction and eventual demand for Schademann to leave her boutique. Although Schademann may have been entitled to enter the victim's business premises at first, upon her specific demand to leave, he was not entitled to remain. Instead, after being asked to end the conversation, Schademann ratcheted up his disclosure of personal information he had learned about the victim, got closer to the victim, began to point his finger at her, and began acting in an "erratic" and "manic" fashion. The victim became increasingly scared, demanded his departure, and locked the door when Schademann finally left. But the incident was not over. A short time later, Schademann returned to her boutique where he knew he was not wanted and attempted to gain access through the locked door. He then returned a third time at the close of business that same day eventually demanding that he had a right to be wherever he wanted, that he could purchase the entire block, and that he knew where the victim lived.

In short, after reviewing the record, it was not the language Schademann used which resulted in his conviction for disturbing the peace. It was the language that he used that intimidated the victim and upset her, resulting in her withdrawal of any right for Schademann to remain in her place of business. Notwithstanding her directive, Schademann continued to pursue her thereafter which culminated in his arrest and conviction. Under these facts, we need not reach the question of whether the language Schademann used in the original confrontation with the victim amounted to "fighting words" or whether those words were protected speech under the First and Fourteenth Amendments. Instead, in our review of the record as a whole, we need only determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Escamilla*, 291 Neb. 181, 190, 864 N.W.2d 376, 383 (2015). As recognized by the Nebraska Supreme Court in *State v. Drahota*, 280 Neb. 627, 788 N.W.2d 796 (2010), a private citizen's peace may be disturbed by another's refusal to leave them alone after having been requested to do so. We hold that the combination of events, namely Schademann's continued pursuit of the victim following her directives to him was sufficient to support Schademann's conviction of disturbing the peace. Schademann's assignment of error is without merit.

CROSS-EXAMINATION OF VICTIM

Schademann next assigns as error that the district court committed reversible error in finding harmless error in the county court's refusal to allow him to cross-examine the victim governing her disclosure of personal information in social media, which he argues he legally obtained. Specifically, during the trial, Schademann attempted to ask the victim about whether she publicized certain personal information on Facebook and Instagram that Schademann could, and allegedly did, access through social media. The court sustained the State's relevancy objection to the line of questioning. As an offer of proof, Schademann argued that the information was relevant in that "much of the information that I'm about to inquire about with regard to [the victim]'s

activity on Instagram, and Facebook, and other websites, explain how one could discover the information that . . . Schademann knew and that is absolutely relevant to this case."

In determining whether the district court erred in finding harmless error in the county court's refusal to allow him to cross-examine the victim governing her disclosure of personal information in social media, we first must consider whether the county court erred in sustaining the State's relevancy objection governing this line of inquiry. For if there was no error by the county court in excluding the evidence in the first instance, there can be no error by the district court in determining that the exclusion was harmless error.

Neb. Rev. Stat. § 27-401 (Reissue 2016) provides that "[r]elevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Thus, in order to be relevant here, the fact of whether the victim disclosed certain personal information on social media which Schademann was able to legally access must be "of consequence to the determination of the action." We find that it is not. It is of no consequence to this action whether Schademann learned personal information about the victim through Facebook, Instagram, or any other medium. The fact that Schademann had been studying the victim's personal life even though they had no pre-existing relationship and the fact that his personal inquiries had nothing to do with her business was alarming to her. Her sense of alarm heightened when Schademann would not discontinue his dialogue which culminated in the victim's insistence that he leave her boutique. Before leaving Schademann got uncomfortably close to her, pointed his finger at her, acted in an erratic manner, and made the victim fear for her safety. After leaving her boutique at the victim's insistence, Schademann returned and tried to gain access through the locked door and returned a third time near the close of business hours.

It was Schademann's actions after disclosing the victim's personal information, however obtained, that resulted in his conviction here. Accordingly the line of questioning governing the source of information was of no consequence to this proceeding and not relevant to the determination of the action. Because we find that the county court did not err in excluding the line of questioning on relevancy grounds, the district court's finding that the exclusion of the evidence did not prejudice Schademann is of no consequence. See *State v. Cortes-Lopez*, 18 Neb. App. 463, 789 N.W.2d 522 (2010) (proper result will not be reversed merely because it was reached for wrong reason). Thus, Schademann's second assignment of error is without merit.

CONCLUSION

Having considered and rejected Schademann's assignments of error, his conviction and sentence are affirmed.

AFFIRMED.