Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/08/2019 09:06 AM CST

State of Nebraska, appellee, v.
Carlos A. Tucker, appellant.
___ N.W.2d ___

Filed December 14, 2018.    No. S-17-926.

1. **Rules of Evidence: Appeal and Error.** An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on relevance, whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice, and the sufficiency of a party's foundation for admitting evidence.

2. **Expert Witnesses: Appeal and Error.** The standard for reviewing the admissibility of expert testimony is abuse of discretion.

3. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

4. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

5. **Evidence: Words and Phrases.** Evidence is relevant if it tends in any degree to alter the probability of a material fact.

6. **Rules of Evidence.** Under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

7. **Evidence.** Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party.

8. **Evidence: Words and Phrases.** Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.

9. ____: ____. Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.

10. **Witnesses: Juries: Appeal and Error.** The credibility and weight of witness testimony are for the jury to determine, and witness credibility is not to be reassessed on appellate review.

11. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

12. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

13. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

14. ____. Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively.

Appeal from the District Court for Lancaster County: Darla S. Ideus, Judge. Affirmed.

Joseph D. Nigro, Lancaster County Public Defender, and John C. Jorgensen for appellant.

Douglas J. Peterson, Attorney General, Erin E. Tangeman, and, on brief, Sarah E. Marfisi for appellee.

Heavican, C.J., Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

Carlos A. Tucker appeals his convictions and sentences for one count of first degree sexual assault of a child and two

counts of incest, related to an incident with his girlfriend's children. Evidence at trial showed that Tucker engaged in sex acts with M.T., age 11, and that M.T. and her two brothers, E.T., age 12, and R.T., age 10, engaged in sex acts upon Tucker's instructions. The main issue presented by this appeal is whether the district court abused its discretion in admitting "Y-STR" DNA evidence over Tucker's objections. We conclude that it did not. We further reject Tucker's contentions that the evidence was insufficient to support his convictions and that the district court imposed excessive sentences. Finding no error, we affirm.

## BACKGROUND

*Charges Against Tucker.*

The State charged Tucker with one count of first degree sexual assault of a child in violation of Neb. Rev. Stat. § 28-319.01(2) (Reissue 2016) and two counts of incest with a person under 18 years of age in violation of Neb. Rev. Stat. § 28-703 (Reissue 2008). The charges arose out of allegations by M.T., E.T., and R.T. that Tucker, their mother's live-in boyfriend, had engaged in sex acts with M.T. and that M.T. had engaged in sex acts with E.T. and R.T. after being instructed to do so by Tucker.

*Pretrial Proceedings.*

Prior to trial, Tucker filed a motion in limine seeking to exclude all evidence of Y-STR DNA testing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001) (*Daubert/ Schafersman*). He also alleged that such evidence would confuse the jury and that its prejudicial effect would outweigh its probative value.

At a pretrial hearing on the motion, the district court heard expert testimony by Shannen Bishop, a DNA analyst at the University of Nebraska Medical Center (UNMC). Bishop testified concerning the Y-STR DNA analysis she conducted on

DNA found on the interior of the shorts M.T. wore on the day of the alleged assault. Bishop also explained the origins, mechanics, and limitations of Y-STR DNA testing, as well as the extent to which it is accepted in the scientific community. Bishop testified that Y-STR DNA testing looks only at the male chromosome portion of DNA, while autosomal DNA testing looks at all 23 chromosomes inherited by each person. She dismissed as irrelevant several journal articles submitted by Tucker purporting to discredit the application of Y-STR DNA testing to small ethnic populations. Bishop explained that the articles examined very small, specific sample sizes and that Y-STR DNA science has improved since the articles were published in the early 2000's. She further pointed out that the U.S. Y-STR database, which she used in her analysis, was not even established when most of the articles were written.

Following the hearing, the district court denied Tucker's motion in limine. It applied the *Daubert/Schafersman* analytical framework and determined the reasoning and methodology behind Bishop's opinions and Y-STR DNA testing to be valid and reliable. The district court further rejected Tucker's argument that the prejudicial effect of Y-STR DNA evidence outweighed its probative value.

*Evidence at Trial.*

At the jury trial, M.T., E.T., and R.T. testified that on the day at issue, their mother was at work and Tucker was home with them. The children testified that Tucker, then age 31, invited them to play a series of games in which he would give the winner candy. The games began innocuously enough with the children competing to be the last to laugh, but they progressed to include the children undressing. In one game, the children undressed and Tucker hid their clothes. In another, Tucker instructed the children to switch clothing with one another.

The children testified that after a series of these games, Tucker directed them to the living room. Tucker instructed the children to disrobe completely, and he played pornography

on the television. The boys testified that Tucker told them to masturbate. All three children testified that at some point while they were in the living room, Tucker licked M.T.'s vagina, and E.T. and R.T. testified that they followed Tucker's instructions to do the same. The three children testified that Tucker also directed M.T. to put her mouth on his penis while, M.T. testified, he used his hand to move her head. All three children also testified that M.T. complied with Tucker's instructions to put her mouth on E.T.'s and R.T.'s penises as well, with R.T. specifying that M.T. "suck[ed]" on their penises. There was also testimony that Tucker placed an electric toothbrush on M.T.'s vagina. The children testified that they saw "white stuff" or "clear stuff" come out of Tucker's penis, which he wiped off with a tissue or napkin. R.T. observed some of the fluid from Tucker's penis fall onto the carpet. M.T. and E.T. testified that Tucker referred to their activities as "sex ed."

During cross-examination, which referenced previous interviews, it was revealed that the children's testimony contained some inconsistencies on such matters as the sequence of the games, the objects of the games, their relative stages of undress during portions of the games, who won each game, the content of the pornography, the sequence of the sex acts, and whether sex acts occurred involving M.T.'s breasts or two persons performing sex acts with M.T. at the same time. However, each child testified that on the day in question, M.T. performed fellatio on Tucker and both brothers upon Tucker's instructions and that Tucker performed cunnilingus on M.T.

Contrary to Tucker's instructions to the children not to disclose what happened, the children informed their mother. After law enforcement was alerted, police conducted a search of the residence the children shared with their mother and Tucker. They found candy wrappers for the same type of candy the children reported Tucker had given to them. A stain found on the living room rug tested positive for semen. DNA testing showed that the semen had the same genetic profile as Tucker and that the probability of randomly selecting an unrelated

individual with a DNA profile matching the sample was 1 in 752.4 quintillion. The State also introduced Y-STR DNA evidence found on the shorts M.T. wore on the day of the alleged offenses. This evidence is discussed in more detail in the section below.

Tucker testified in his own behalf. He denied engaging in any sex acts with the children.

*Y-STR DNA Evidence.*

The State called Bishop to testify regarding Y-STR DNA testing. Tucker's counsel made a continuing objection to the Y-STR DNA testing and any opinions derived from such testing based on *Daubert*/*Schafersman*, because such evidence was "inherently unreliable and unfairly prejudicial and otherwise not relevant." The district court overruled the continuing objection.

Bishop testified that she is a forensic science DNA analyst at UNMC and that she had performed Y-STR DNA testing on extractions from the interior of M.T.'s shorts. Bishop stated that Y-STR DNA testing was a method of looking only at the male Y-chromosome. Bishop explained Y-STR DNA testing is often used in sexual assault cases because it can identify a male's contribution to a sample, such as a vaginal swab, that may have many more cells from a female contributor than a male contributor. Bishop testified that UNMC has performed Y-STR DNA analysis since the early 2000's and that UNMC has used the particular Y-STR DNA kit used in this case since 2012. Bishop stated that Y-STR DNA analysis is an accepted forensic tool in the forensic analysis community that has been available since the early 2000's.

Bishop explained that the Y-STR DNA testing process is essentially the same as autosomal DNA testing, but admitted that there is a great deal of difference between the discriminatory power of autosomal DNA testing versus Y-STR DNA testing. She testified that autosomal DNA testing can produce results showing that a particular profile is extremely rare in the

population, but because the same Y-STR DNA profile is passed to all males in the same lineage and additionally may be present in unrelated members of the general population, Y-STR DNA testing results will not show that a particular profile is as rare. She acknowledged that a coincidental random match might occur one in several quintillion times with autosomal DNA testing but one in a few thousand times with Y-STR DNA testing.

Bishop testified that Y-STR DNA testing identified Y-STR DNA present on the interior of M.T.'s shorts and that it consisted of a mixture of at least two male individuals. Bishop testified that she could not determine what type of cell contributed the Y-STR DNA profile to M.T.'s shorts or how it was deposited there. However, she stated that the major Y-STR DNA profile she found on the shorts matched Tucker at all of the loci obtained and that, consequently, Tucker was not excluded as a potential major source of the DNA tested.

Bishop testified that to calculate the frequency of Tucker's Y-STR DNA profile within the population, it was necessary to consult a database. Bishop testified and her report reflected that according to the U.S. Y-STR database, the probability of randomly selecting a second individual with the same Y-STR DNA profile, given that Tucker expresses such a profile, was 1 in 1,842 for African Americans. Tucker does not dispute the he is African American.

Bishop's report reflected that the U.S. Y-STR database was maintained by a national institute in the forensic science field. Bishop admitted that the U.S. Y-STR database had changed since her analysis because it is always gaining contributors. She further admitted that it was possible that the more individuals that contribute, the better the database will be at discerning the likelihood of a particular profile appearing in the general population.

A forensic scientist with the Nebraska State Patrol Crime Laboratory's biology unit also explained the statistical limitations arising from the patrilineal recurrence of Y-STR DNA

and the possible occurrence in the general population, consistent with Bishop's testimony.

*Jury Verdict and Sentencing.*

The jury returned a verdict finding Tucker guilty on all charges. The district court ordered a presentence investigation report (PSR). The PSR reflected that Tucker, then age 33, had a traumatic childhood. Tucker's father was not involved in his life, and he reported that he and his 10 siblings all have different fathers. Tucker grew up in an area where gang crime and drugs were prevalent. He reported that his mother was a drug user and that he "'had to find ways to eat and live.'" As a child, he witnessed his mother shoot her boyfriend, and he developed post-traumatic stress disorder as a result. He has also been diagnosed with paranoid schizophrenia, bipolar disorder, and manic depression.

Tucker has been involved in criminal activity since his youth. His criminal history includes a term of probation and incarceration for forgery and escape and other jail terms of considerable length for theft. His other offenses include a number of drug charges, false information, false reporting, failure to appear, attempted tampering with a witness, and various traffic offenses.

Tucker had completed an associate degree in theology and anthropology, and he wanted to continue his education. At the time of the present offenses, he was an owner-employee of an aquatic pet store. In the past, Tucker had worked as a dishwasher, cook, and telemarketer. When he was not employed, he supported himself by selling marijuana.

The PSR noted that Tucker had refused to take responsibility for the crimes charged, consistently maintaining that he had not committed them and declining to participate in risk assessment for sex offenses. The PSR also included a victim impact letter from the children's mother. She stated that Tucker's crimes had led to a deterioration of her relationships with her children and behavior issues.

At the sentencing hearing, the district court stated that it had considered the evidence at trial and the PSR in their entirety, particularly Tucker's pattern of criminal behavior and failure to take responsibility for his actions or empathize with the victims in this case. The district court noted that its sentencing took into account the nature and circumstances of the crimes and Tucker's history, character, and condition.

The district court sentenced Tucker to 30 to 50 years' imprisonment for first degree sexual assault of a child and 10 to 20 years' imprisonment for each of the two counts of incest, with all sentences to be served consecutively.

Tucker now appeals his convictions and sentences.

## ASSIGNMENTS OF ERROR

Tucker assigns, rephrased, (1) that the district court erred in admitting unreliable Y-STR DNA evidence, causing undue prejudice; (2) that the evidence was insufficient to prove the crimes charged; and (3) that the district court abused its discretion in imposing excessive sentences.

## STANDARD OF REVIEW

[1] An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on relevance, whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice, and the sufficiency of a party's foundation for admitting evidence. *State v. Trotter*, 299 Neb. 392, 908 N.W.2d 656 (2018).

[2] The standard for reviewing the admissibility of expert testimony is abuse of discretion. *State v. Oliveira-Coutinho*, 291 Neb. 294, 865 N.W.2d 740 (2015).

[3] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in

the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Wells*, 300 Neb. 296, 912 N.W.2d 896 (2018).

[4] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Ortega*, 290 Neb. 172, 859 N.W.2d 305 (2015).

## ANALYSIS

*Admissibility of Y-STR DNA Evidence.*

Tucker challenges the admission of the Y-STR DNA testing and any opinions derived from such testing. His brief contends that the probative value of this evidence was outweighed by its prejudicial effect because the evidence is unreliable. We understand Tucker to be making two basic arguments against the admissibility of the Y-STR DNA evidence. The primary argument is a contention that the inherent nature of Y-STR DNA evidence makes its admission unfairly prejudicial in any case. The second challenges the reliability of the conclusions regarding the Y-STR DNA evidence reached in this case. We take up each of these contentions in turn.

[5-9] We first address Tucker's arguments that the Y-STR DNA evidence was unfairly prejudicial. Evidence is relevant if it tends in any degree to alter the probability of a material fact. *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016). Under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Grant, supra.* Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party. *State v. Chauncey*, 295 Neb. 453, 890 N.W.2d 453 (2017). Unfair prejudice means an undue tendency to suggest a decision based on an improper basis. *Id*. It speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis. *Id*.

Tucker's primary argument against the admission of the Y-STR DNA evidence is that juries will inevitably base their decision on an improper basis by incorrectly perceiving the Y-STR DNA "match" testimony as conclusively connecting the defendant to the sample. Tucker asserts that jurors are inclined to think of any evidence of a DNA "match" of having an extremely small probability of being the result of coincidence. But, as he correctly points out, the Y-STR DNA testing in this case led to a 1-in-1,842 chance of a coincidental match. According to Tucker, this relatively greater chance of a random match renders the evidence "completely unreliable." Brief for appellant at 37.

We have previously recognized a risk that a jury might give undue weight to DNA evidence if it is introduced without proper context. See *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015). In *Johnson*, we observed that "'[b]ecause the potential precision of DNA testing is so well known, a jury might assume that any DNA profile match is extremely unlikely and therefore extremely probative'—even when this is not true." 290 Neb. at 883, 862 N.W.2d at 774, quoting *Peters v. State*, 18 P.3d 1224 (Alaska App. 2001). We have not, however, concluded that the appropriate measure to prevent a jury from making such an assumption is the wholesale exclusion of DNA evidence falling below a certain threshold of precision. Rather, we have emphasized the need for evidence of DNA testing to be accompanied by evidence of the statistical significance of the findings if it is to be admitted. *Johnson, supra.*

In this case, Tucker cannot contend that the State sought to introduce the Y-STR DNA evidence without the necessary statistical context. As we have noted, the State introduced much evidence regarding the statistical context for the Y-STR DNA evidence. The jury heard explanations of the relative probative value of Y-STR DNA testing and autosomal DNA testing. Both forensic scientists testified that males share the same Y-STR DNA profile with other males in the same paternal lineage,

as well as others in the general population. Their testimony clearly illustrated that due to this recurrence, Y-STR DNA testing results are not as probative as autosomal DNA testing results. They both explained that Y-STR DNA statistical analysis would not render coincidental random match probabilities such as one in several hundred quintillions, showing a particular profile is extremely rare in the population. Instead, Bishop testified, Y-STR DNA testing might produce a random match probability of one in a few thousand, as it did in this case, where Y-STR DNA statistical analysis revealed a 1-in-1,842 probability for African-American contributors that a random Y-STR DNA profile unrelated to this case would match the profile found on M.T.'s shorts. Because the Y-STR DNA testing results were accompanied by the required statistical context, its admission was consistent with the principles we set forth in *Johnson*.

Moreover, we do not believe that Y-STR DNA evidence is so unique that something other than the principles of *Johnson* should govern its admissibility. The probabilities of a coincidental match may be exponentially greater with Y-STR DNA evidence than with autosomal DNA evidence, but, if those differences are explained to the jury, we see no reason why jurors would be incapable of grasping the difference. We have previously rejected claims that jurors would not be capable of assigning appropriate weight to "the statistical analysis that accompanies DNA evidence," *State v. Bauldwin*, 283 Neb. 678, 703, 811 N.W.2d 267, 288 (2012), and reject any suggestion that would be the case with Y-STR DNA evidence.

Y-STR DNA evidence may be less probative than other DNA evidence, but if we were to find it inherently prejudicial, as Tucker urges, we would be treating such evidence differently from other types of evidence that have similar probative value and that are introduced for the same purpose. As the district court and other courts have observed, Y-STR DNA evidence can be used in much the same manner as shoe imprint evidence. Shoe imprint evidence is routinely admitted to show

that an imprint at a crime scene matches shoes owned by a defendant even though any number of individuals may own shoes identical to the defendant's.

> The coincidence that [a Y-STR DNA] profile matches that of defendant is probative of his guilt in the same manner as if he had owned shoes that matched a foot imprint found at the crime scene. It is up to the jury to weigh the probative value of that evidence in light of the fact that a significant number of other individuals may possess the same profile.

*State v. Calleia*, 414 N.J. Super. 125, 152, 997 A.2d 1051, 1066 (2010), *reversed on other grounds* 206 N.J. 274, 20 A.3d 402 (2011). See, also, *People v. Stevey*, 209 Cal. App. 4th 1400, 148 Cal. Rptr. 3d 1 (2012).

Finally, we note that our conclusion that the Y-STR DNA evidence introduced in this case was not unfairly prejudicial is not a novel conclusion. Courts in a number of other states have reached the same conclusion. See, e.g., *State v. Escalante-Orozco*, 241 Ariz. 254, 386 P.3d 798 (2017), *abrogated on other grounds, State v. Escalante*, 245 Ariz. 135, 425 P.3d 1078 (2018) (Y-STR profile evidence is not misleading, nor is its probative value outweighed by risk of unfair prejudice; jury is capable of understanding limited probative value of this evidence and giving it whatever weight it deserves); *State v. Jones*, 345 P.3d 1195 (Utah 2015) (Y-STR DNA evidence properly explained to jury such that risk of unfair prejudice through confusing or misleading jury did not substantially outweigh probative value of evidence); *People v. Wood*, 307 Mich. App. 485, 862 N.W.2d 7 (2014), *vacated in part on other grounds* 498 Mich. 914, 871 N.W.2d 154 (2015) (limitations of Y-STR DNA testing were presented to jury such that there was no danger of confusion or other unfair prejudice that would substantially outweigh probative value).

Having rejected Tucker's argument that Y-STR DNA evidence is inherently unfairly prejudicial, we move to Tucker's

assertion that the testimony offered regarding the Y-STR DNA evidence in this case was unreliable. Here, Tucker claims that the database used by Bishop to arrive at her statistical conclusions may not be representative of the population in a given area and that therefore, there is a risk that Tucker's Y-STR DNA is even more common than Bishop acknowledged and thus there is an even greater chance of a coincidental match. This seems to be an attempt at a *Daubert*/*Schafersman* challenge, even though Tucker's brief does not cite to *Daubert*/*Schafersman* or address its framework. But even if we liberally construed Tucker's brief as having framed his argument as a *Daubert*/*Schafersman* issue, the argument fails.

Tucker's argument is premised in part on contentions about the U.S. Y-STR database made in articles published in 2003. Bishop, however, testified at the *Daubert*/*Schafersman* hearing that she was familiar with the articles Tucker relies upon. She explained that she found these articles to be irrelevant, because they were about very small sample sizes and Y-STR DNA science has improved since their publication. In fact, she testified that the U.S. Y-STR database upon which she relied was not even established at the time the articles upon which Tucker bases his challenge were written. The remaining article Tucker cites to support this argument was not presented to the district court and is not in the record before us for consideration. See *State v. Patton*, 287 Neb. 899, 845 N.W.2d 572 (2014) (party's brief may not expand evidentiary record). Given Bishop's testimony concerning the articles Tucker offered to the district court, we see no abuse of discretion in the admission of the Y-STR DNA evidence.

In sum, we conclude that the Y-STR DNA evidence in this case did not suggest a decision based on an improper basis and that thus, its prejudicial effect did not outweigh its probative value. Moreover, Tucker's *Daubert*/*Schafersman* arguments also fail. Therefore, the district court did not abuse its discretion in admitting such evidence at trial.

*Sufficiency of Evidence.*

We next address Tucker's argument that the evidence was not sufficient to support his convictions. The relevant question when such a challenge is made is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. McCurdy, ante* p. 343, 351, 918 N.W.2d 292, 298 (2018). Tucker, however, does not contend that there was no evidence of the essential elements of either first degree sexual assault of a child or incest. And, given the testimony at trial that Tucker penetrated M.T.'s mouth with his penis when M.T. was 11 years old and Tucker was 31 years old; that Tucker performed cunnilingus on M.T.; that Tucker placed an electric toothbrush on M.T.'s vagina; and that upon Tucker's instructions, M.T. performed fellatio on E.T. and R.T., and E.T. and R.T. performed cunnilingus on M.T., such an argument is not available to him.

Instead, Tucker argues that because the children "did not testify to a cohesive story either individually or collectively," brief for appellant at 43, no rational juror could have found Tucker guilty beyond a reasonable doubt. In other words, Tucker is asking us to reweigh the evidence and find that the testimony of the children was not credible. "But that is not the role of an appellate court." *State v. Jones*, 296 Neb. 494, 499, 894 N.W.2d 303, 307 (2017).

[10] The credibility and weight of witness testimony are for the jury to determine, and witness credibility is not to be reassessed on appellate review. *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007). Our task is limited to determining whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Tucker committed the charged offenses. See *id.* Based on the evidence summarized above, we conclude it could.

*Excessive Sentences.*

Finally, we address Tucker's claim that he received excessive sentences. Tucker does not dispute that the sentences imposed were within statutory limits. Rather, he argues only that the district court did not meaningfully consider his childhood trauma, mental condition, and need for rehabilitation. We conclude that the district court did not abuse its discretion in sentencing Tucker.

[11-14] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Russell*, 299 Neb. 483, 908 N.W.2d 669 (2018). Relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Steele*, 300 Neb. 617, 915 N.W.2d 560 (2018). And generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *State v. Leahy, ante* p. 228, 917 N.W.2d 895 (2018).

Our review of the record demonstrates that the district court properly considered and applied the necessary sentencing factors. The PSR shows that Tucker exhibited mental illness after having grown up in an environment of poverty, crime, drug use, instability, and trauma. Certainly, these disadvantages were relevant to the sentencing calculus, but the district court stated that it considered the PSR in its entirety, and we have

no reason to believe the district court did not weigh those disadvantages against other factors. Those other factors, however, would include Tucker's significant pattern of criminal behavior and the nature of the offenses at issue. On this point, the record shows that Tucker's crimes against the children in this case were particularly serious. Tucker used games and candy to systematically lure children in his care into participating in acts that will have a lasting negative impact on their lives. And as the district court emphasized, Tucker has not taken responsibility for his actions.

Having reviewed the record and the district court's remarks in light of the familiar sentencing factors set forth above, we conclude that the district court did not abuse its discretion in sentencing Tucker within statutory limits.

## CONCLUSION

We conclude that the district court did not abuse its discretion in admitting Y-STR DNA evidence at trial. We further determine that the evidence presented at trial was sufficient to support Tucker's convictions and that the district court did not abuse its discretion in sentencing him. Consequently, we affirm.

AFFIRMED.

MILLER-LERMAN, J., not participating.