IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. FORD

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JACOB FORD, APPELLANT.

Filed March 5, 2019.    No. A-18-478.

Appeal from the District Court for Douglas County: JAMES T. GLEASON, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and John J. Jedlicka for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Jacob Ford appeals his conviction of intentional child abuse causing serious bodily injury and the sentence imposed thereon. He contends that the district court erred in improperly excluding certain evidence, failing to allow him to complete an offer of proof, improperly admitting evidence, that the evidence was insufficient to support his conviction, and that the sentence imposed was excessive. Having reviewed his assigned errors and finding them to be without merit, we affirm his conviction and sentence.

## II. STATEMENT OF FACTS

At about 4:15 a.m. on August 3, 2017, Kara Payne was at work when she received a telephone call from Ford informing her that he had dropped their 7-week-old daughter, Skylar Ford, and she was being transported by ambulance to the University of Nebraska Medical Center (UNMC). At the hospital, Ford informed medical personnel that he dropped Skylar, she hit her

head on her crib, then hit her head on the wood floor. Skylar suffered from subdural hemorrhaging, retinal hemorrhaging in both eyes, and a global brain injury caused by a lack of oxygen and blood to her brain. Doctors determined that Skylar's injuries could not have been caused by the events as reported by Ford and concluded that the cause of her injuries was abusive head trauma. Ford was charged with intentional child abuse resulting in serious bodily injury, a Class II felony. See Neb. Rev. Stat. § 28-707(1) and (7) (Reissue 2016). Because Ford did not dispute that he caused Skylar's injuries, the only issue at his March 12, 2018, bench trial was whether he did so intentionally.

## 1. EVIDENCE PRESENTED AT TRIAL

### (a) Background

Skylar was born on June 13, 2017, and prior to August 3, she had been developing normally and only had minor health issues. On August 2, Payne spent time with Skylar before she had to leave at 5 p.m. to be at work at 5:30 p.m. Payne bathed Skylar, fed her, changed her diaper, and played with her. During this time, Skylar was eating and acting normally and was not having any breathing issues. After Payne left the house at 5 p.m. for work, she left Skylar in Ford's care. The following morning at about 4:15 a.m., Ford called her and told her that he had dropped Skylar and that she needed to meet him at UNMC. At the time that Skylar was transported to the hospital she was unresponsive and her breathing was not conducive to sustaining life. Skylar was treated at the ER, then admitted to the pediatric intensive care unit (PICU). Doctors determined that Skylar suffered from subdural hemorrhages, including a midline hemorrhage; retinal hemorrhages in both eyes with the right side worse than the left (bleeding in the back of the eye in the retina); and a global brain injury.

Ford was arrested and charged with intentional child abuse resulting in serious bodily injury. On August 4, 2017, Payne called Ford at the jail and spoke to him about his involvement in Skylar's injuries. During the course of the call, Ford continued to assert that he dropped Skylar and she hit her head on the crib and the floor. The State offered into evidence exhibit 25 which contained two August 4 jailhouse telephone calls between Ford and Payne. This exhibit was received into evidence over Ford's objections which we will detail later in the analysis portion of this opinion. When Ford's attorney asked Payne questions about conversations that Payne had with Sergeant Marlene Novotny prior to Payne's jailhouse call with Ford, the State objected on the basis of hearsay and relevance, which objections were sustained. Ford was allowed to make an offer of proof which he contends the district court did not allow him to complete and which we discuss in detail in the analysis portion of this opinion.

Payne testified that she informed medical personnel that a "week or week and a half prior" to August 1, 2017, Skylar had fallen off a foot stool and "smacked her head" on the living room floor. After this accident, Skyler was breathing and did not require a trip to the hospital. Evidence adduced by the State established that, prior to August 3, Skylar had been developing normally and there was nothing in Skylar's medical history to explain her injuries.

The State's expert witnesses included Dr. Bridget Norton, Dr. Suzanne Haney, and Dr. David Poage. Drs. Norton, Poage, and Haney all testified that abusive head trauma is a generally accepted or recognized diagnosis in the medical community.

*(i) Dr. Bridget Norton*

After being seen in the emergency room, Skylar was moved to the PICU where she was treated by Dr. Norton, who is board-certified in pediatrics and pediatric critical care. Prior to conducting a physical examination of Skylar, Norton reviewed Skylar's ER records and the results of Skylar's radiology exams.

Dr. Norton testified that Skylar suffered subdural bleeding in her brain which is caused when blood vessels in the brain "tear and blood fills up that space between the dura[, a hard covering that surrounds the outside of the brain and the spinal cord,] and the brain." According to Norton, subdural bleeding can be caused by "anything that forcefully moves the head back and forth so that the brain moves within the skull." Norton testified that, based upon the history that she was provided, which was that Skylar had been dropped by her father and hit her head on the crib and then the floor, and her review of radiology, "the story and the fall from a height of just being in someone's arms was not sufficient force to cause the degree of bleeding that we had." When Norton physically examined Skylar, Skylar was drowsy but would stir intermittently during the exam, Skylar was breathing on her own, her eye exam was normal, and, other than her lower level of consciousness, her neurological exam was "unremarkable." Norton was concerned with the amount of bleeding in Skylar's brain placing Skylar at a risk for swelling, seizures, and brain damage. Later that day, Skylar started having seizures and she was placed on multiple anti-seizure medications. Norton also stated that they decided to put a breathing tube in to protect Skylar's airway and allow doctors "to be better able to control [Skylar's] seizures and because of concerns for ongoing injury to the brain and swelling and . . . intracranial pressure." During the days that Skylar was in the PICU, her condition worsened. Norton was concerned that Skyler had a degree of brain swelling that was putting Skyler "at increased risk for increased intracranial pressure, which is a risk of ongoing damage to the brain."

Norton testified that a child with Skylar's type of brain injury is in a potentially life-threatening condition if left untreated and that she would consider this a "serious bodily injury." Further, Norton testified that, based upon her review of the radiology, her care of Skylar, and how Skylar's condition deteriorated, her opinion within a reasonable degree of medical certainty as to the mechanism that she believed caused Skylar's injuries was abusive head trauma and that Skylar's injuries were caused by some type of acceleration/deceleration.

*(ii) Dr. Suzanne Haney*

Dr. Haney is medical director of the Children's Advocacy Team and is board certified in pediatrics and child abuse pediatrics. She became involved in Skylar's case after being contacted by Skylar's treating physicians at the PICU. Upon arriving at the PICU, Haney spoke with Skylar's parents, examined Skylar, and reviewed Skylar's medical records, diagnostic images, and laboratory information. According to Haney,

Skylar had a brain injury which was evidenced by her seizures and on the MRI. She also had bleeding around her brain, between her brain and her skull, called a subdural hematoma, that was present both around, in between both halves of her brain, up underneath it, and she had bleeding to the back of both eyes.

Haney testified that, based upon the history that she was provided, her care of Skylar, and her observation of Skylar's injuries, she determined that Skylar was a victim of abusive head trauma. According to Haney, it was not possible for Skylar to have been dropped in the manner described by Ford due to the severity of Skylar's brain injury, the injuries to her eyes, and the location of the bleeding which was all around, in between, and underneath her brain.

### (iii) Dr. David Poage

Dr. Poage is the radiologist who reviewed Skylar's CT and MRI scans. Poage testified that he reviewed Skylar's initial CT scan taken on August 3, 2017, and her August 5 MRI. He observed several subdural hemorrhages, some of which were "acute" and others which appeared to be older. He explained that, from a radiologist's perspective, "acute" means that whatever caused the subdural hemorrhage happened very recently from "minutes to maybe a couple of days" to the time that the imaging is taking place. He noted that Skylar also sustained a subdural hemorrhage along the midline of her brain. Dr. Poage explained that a subdural hemorrhage in children especially along the midline, or middle between the two hemispheres of the brain, is more indicative of non-accidental trauma. Poage also noted that Skylar suffered a "hypoxic-ischemic injury," a lack of oxygen and/or lack of blood flow to the brain, which injury occurred at the same time as the injury that brought her to the hospital.

Poage stated that Skylar's September 20, 2017, CT scan showed that her subdural hemorrhages continued to grow and her brain had shrunk considerably. The December 1 MRI showed chronic subdural hemorrhages and Skylar's brain was much smaller than normal. He testified that Skylar's brain had essentially died in certain areas and her functioning as of that date would be "minimal."

Poage testified that it is possible to shake a child under the age of five resulting in a subdural hemorrhage. He further testified that it is possible to shake a child under the age of one resulting in a subdural brain bleed. Further, it is possible that a child could sustain a subdural brain bleed without having visible symptoms and that Skylar could have sustained some type of trauma earlier than August 3, 2017, and not been symptomatic.

He further testified that, based upon his training and experience, an accidental fall from about 2½ feet would be "very unlikely" to cause the types of brain bleeds that were present in Skylar's CT and MRI images. He further testified that accidently dropping a child from a height of 33 inches "would be very unlikely" to cause the degree of hemorrhage suffered by Skylar "especially along the midline." Poage testified that Skylar's hypoxic-ischemic injury "was something that you'd never expect . . . just from being dropped, whether two surfaces were hit or not." Poage stated that "[u]ntreated or not, hypoxic-ischemic injury doesn't go away. And I didn't read anything further on this patient's chart, but I would be shocked if there's much function because the brain is no longer functional, I'm sure. It's mostly gone." Finally, Poage testified that

based upon his review of the CT and MRI images and the particular history that was provided in this case, i.e., an accidental fall from a height of about 33 inches, his opinion, within a reasonable degree of medical certainty as to the cause of Skylar's injuries was "suspicious for child abuse."

## (c) Defense Experts

Ford called two witnesses to testify in his defense: Dr. Robert K. Rothfeder, a former emergency room physician, and Kenneth Monson, Ph.D., a biomechanical engineer and associate professor at the University of Utah.

### (i) Dr. Robert K. Rothfeder

Dr. Rothfeder reviewed Skyler's medical records, police reports, interviews, materials from a 911 call, materials related to cell phone records, and Dr. Monson's report in preparing for this case. Rothfeder testified that in his opinion, based upon his education, training, and experience as to a reasonable degree of medical certainty, Skylar suffered "blunt head trauma" which caused her injuries. He further testified that an accidental cause could not be precluded, but that he also could not rule out that the cause of Skylar injuries was intentional. When asked if, "based on your education, training and experience, to a reasonable degree of medical certainty, is it possible for a short fall from two or three feet to cause the injuries you've seen on Skylar?", Rothfeder responded, "I believe so." Rothfeder further opined that the possible causes of Skylar's symptoms included a short fall and impact head trauma.

### (ii) Kenneth Monson, Ph.D.

Monson is a biomechanical engineer and associate professor at the University of Utah. Biomechanics is the application of mechanics to biological tissues or understanding of how the human body responds to the application of force. Monson opined that a fall, as described by Ford, had the "potential for producing significant injury." Additionally, based upon his education, training, experience, and research, Monson opined that Skylar's injuries could have resulted from the fall as described by Ford. However, Monson admitted that he could not rule out that the injuries were inflicted intentionally.

## (d) State's Rebuttal Witness: Haney

The State called Haney as a rebuttal witness. Haney defined "abusive head trauma" as "the application of force to a child by a caregiver which results in injury to the head or [its] content[s]." Haney testified that she reviewed Skylar's CT and MRI images and, based upon her review, Skylar suffered multiple injuries, which she stated meant injuries incurred on different dates. Haney testified that, based upon her training and experience, a short fall with Skylar hitting her head on a crib and then hitting the floor was not a possibility given her injuries because with that type of impact "you would expect a focal injury, if any at all." According to Haney, based upon her work as a pediatric child abuse doctor, she believed "that Skylar was violently shaken and/or slammed" which caused her injuries.

## 2. Verdict and Sentence

The district court found Ford guilty of the charged offense. Thereafter, the court sentenced Ford to 10 to 20 years' imprisonment with credit for 263 days served. Ford has timely appealed to this court and is represented by the same counsel that represented him at trial and sentencing.

## III. ASSIGNMENTS OF ERROR

Ford contends that the district court erred (1) in excluding certain evidence; (2) in not allowing Ford to complete his offer of proof; and (3) in admitting into evidence exhibit 25, the recorded telephone "jail call" of Payne and Ford. Ford also contends that (4) the evidence was insufficient to support his conviction and (5) the sentence imposed was excessive.

## IV. STANDARD OF REVIEW

A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018).

An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. *State v. Schuller*, 287 Neb. 500, 843 N.W.2d 626 (2014). In making this determination, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. *Id.* Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Tucker*, 301 Neb. 856, 920 N.W.2d 680 (2018).

## V. ANALYSIS

### 1. Erroneous Exclusion of Evidence

Ford's first assignment of error challenges the trial court's exclusion of evidence, specifically his attempt to introduce Payne's recollection of statements made by Sergeant Novotny to Payne. In order to analyze this assignment, we must first provide context to the proposed statements Ford desired to elicit. The State offered, as exhibit 25, the recorded telephone "jail call" of Payne and Ford. During that call, Payne questioned Ford about whether he intentionally shook their child, Skyler. In response to the State offering this recorded call, Ford attempted to question Payne on the source of her information which led to her questions of Ford. Specifically, Ford's counsel attempted to question Payne about her prior conversations with Sergeant Novotny which he argued "affected Payne's state of mind . . . in that later jail call." Brief for appellant at 27. The State objected on the basis of relevancy and hearsay and the trial court sustained the State's objections. Following the court's ruling, Ford made an offer of proof wherein he asserted that, if Payne was allowed to testify about her conversation with Sergeant Novotny, Payne would testify about statements made by Sergeant Novotny to Payne on why Novotny believed Ford engaged in abusive behavior with their child. Ford argues that by precluding this testimony, the court excluded

relevant testimony which would have demonstrated how Payne obtained her "state of mind" prior to her call with Ford. Ford's argument is misplaced.

"To be admitted at trial, evidence must be relevant, meaning 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *State v. Rocha*, 295 Neb. 716, 731, 890 N.W.2d 178, 193 (2017), quoting Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 2016). "'[I]f the evidence fails to alter the probabilities of the existence or nonexistence of a fact in issue, the evidence is irrelevant.'" *Id*. at 731, 890 N.W.2d at 194, quoting *State v. Harrold*, 256 Neb. 829, 593 N.W.2d 299 (1999).

Here, the issue was whether Ford intentionally caused Skyler's injuries. The record previously established that Payne was not home at the time of the incident and had no personal knowledge of how Skyler's injuries occurred. By the time of the "jail call," Ford had been arrested on suspicion of having intentionally caused Skyler's injuries. Payne's call was an attempt by her to probe Ford on the cause of Skyler's injuries. Whatever information Sergeant Novotny shared with Payne was of no consequence to the determination of the action because Payne's state of mind was not of consequence to the determination of the action. The purpose of the "jail call," and the State's submission of the recorded call, was to elicit Ford's reaction and response to the questions that Payne posed to Ford. Unlike Payne's state of mind, Ford's reaction and response to Payne's questions was a fact that was of consequence to the determination of the action. In sum, although Sergeant Novotny's conversation with Payne, or Payne's conversation with doctors, police, or the nature of the charge itself may have impacted Payne's "state of mind" in making the call to Ford and questioning him, Payne's state of mind had no relevance to the ultimate issue in this case--whether Ford committed the knowing and intentional act of abuse which resulted in serious bodily injury to Skyler.

This proposition is further exemplified by the court's ruling on another question elicited of Payne by Ford's counsel. When counsel asked whether Payne had "a belief of what happened prior to meeting with Sergeant Novotny," the State objected on relevance grounds and the court sustained the objection. In doing so, the court rightly determined that Payne's state of mind was completely irrelevant to the case. What Payne learned secondhand from Sergeant Novotny or others, and any opinions or conclusions she drew from such information were completely irrelevant to the proceeding. Because Sergeant Novotny's prior conversation with Payne, both non-percipient witnesses, were not relevant to the proceeding, we need not address whether Sergeant Novotny's statements to Payne were hearsay or nonhearsay due to the effect of the statements on the "hearer" as was argued by Ford. See *State v. Hansen*, 252 Neb. 489, 562 N.W.2d 840 (1997) (state-of-mind exception to hearsay rule allows admission of extrajudicial statements to show state of mind of declarant only if declarant's then existing state of mind is material issue in case). Similarly, the "effect on hearer" rule would allow the admission of a statement under its governing principles only if the state of mind of the hearer is a material issue in the case. Because we hold that Payne's state of mind was not a material issue in the case, the statements made to her were not relevant and we need not address an issue not meaningful to the outcome of the case. See *State v. Nolt*, 298 Neb. 910, 906 N.W.2d 309 (2018) (appellate court not obligated to engage in analysis not necessary to adjudicate case and controversy before it).

## 2. INCOMPLETE OFFER OF PROOF

As we previously set forth, the recorded "jail call" between Payne and Ford was received as an exhibit during trial. Following its admission, Ford attempted to question Payne about prior conversations with Sergeant Novotny which were excluded by the court. Following the court's ruling, Ford attempted to make an offer of proof governing what Payne would have testified to if allowed. In making the offer of proof, Ford argues that prior to concluding his full offer of proof, he was cut off in an "unorthodox" way and prohibited from completing his offer. Brief for appellant at 30. The full colloquy between Ford's counsel and the court was as follows:

[Defense Counsel]: Your honor, if I may make an offer of proof?

THE COURT: You may.

### OFFER OF PROOF EXAMINATION

BY [Defense Counsel]:

Q. Now, when you met with Sergeant Novotny, was she mainly telling you her opinion on the case?

[State]: This is an offer of proof?

[Defense Counsel]: Yes, offer of proof.

THE COURT: As to which objection?

[Defense Counsel]: The last objection regarding the conversation and hearsay and the state of mind --

THE COURT: Not the relevance objection?

[Defense Counsel]: And the relevance as will (sic).

THE COURT: Both? All right. You may proceed. You want to do it by question and answer?

[Defense counsel]: Yes.

THE COURT: You may.

Q. (By [Defense counsel]) Was the bulk of the meeting with Sergeant Novotny . . . telling you her opinion about what happened?

A. Yes.

Q. Was she using a commanding tone of voice?

A. Yes.

Q. Was she repeatedly saying it had to be intentional?

A. Yes.

Q. Did she in a commanding tone tell you to look at her at times?

A. Yes.

Q. Did she tell you that, we're on your team as long as you're on our team?

A. Yes.

Q. Prior to the hospital meeting with Sergeant Novotny, had you had concerns that this was an intentional act?

[State]: I'm sorry. Does that conclude your offer of proof?

[Defense Counsel]: No.

THE COURT: I think you are done with the offer of proof. The issues raised were the hearsay and the tone. You're now moving on to a new area. That will conclude the offer of proof.

In the court's opinion, the objections both remain sustained.

Ford argues that the court's curtailment of his offer of proof prohibited him from fully establishing the relevancy of Novotny's statements to Payne. Specifically, Ford argues that, had the court not cut him off, he could "connect how Novotny's statement directly affected Payne since exhibit 25 has Payne emotionally yelling at Ford about Abusive Head Trauma at a time when Payne was very emotional. The line of questioning was extremely relevant . . . and important for the defense to explain exhibit 25." Brief for appellant at 30.

Neb. Rev. Stat. § 27-103(1) (Reissue 2016) provides:

Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:

. . . .

(b) In case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked.

"[I]n order to predicate error upon a ruling of the court refusing to permit a witness to testify, or to answer a specific question, the record must show an offer to prove the facts sought to be elicited." *State v. Schreiner*, 276 Neb. 393, 407, 754 N.W.2d 742, 755 (2008). That said, the offer itself need not be a detailed recitation of the excluded testimony but simply enough to provide the general nature of the testimony so that an appellate court can properly review its effect. Cf. *Birkel v. Hassebrook Farm Serv.*, 219 Neb. 286, 363 N.W.2d 148 (1985). Here, Ford argues that he was not allowed to expand enough in his offer of proof so as to demonstrate how the excluded evidence was relevant to the court. We disagree.

Ford's offer of proof clearly delineated that he believed Sergeant Novotny's statements to Payne and Sergeant Novotny's impact on Payne were relevant to the case. The court ended the offer of proof once Ford began to venture into a question governing whether Payne had individually drawn conclusions about Ford's guilt or innocence prior to her conversation with Sergeant Novotny. As explained in the previous section of this opinion, Payne's state of mind was not relevant to the issue in this case. Ford's offer of proof was more than adequate to apprise this appellate court of the general nature and likely effect of the excluded testimony. Because Ford made an offer of proof which adequately communicated the substance and likely effect of the excluded testimony, this assignment of error is without merit.

### 3. PAYNE'S STATEMENTS CONTAINED IN "JAIL CALL"

Ford next argues that the district court improperly overruled his objection to the admission of Payne's statements to Ford contained in the "jail call" received into evidence as exhibit 25. After the State offered exhibit 25 into evidence, Ford objected "on form except for the limited

purpose to explain state of mind at the time of the phone calls." That objection was followed by the following colloquy:

> [Defense counsel]: What happens is, there was a time when --
>
> THE COURT: Excuse me . . . This is very simple. We've got a record of a conversation that includes the defendant, which means this may be an admission. Do you have an objection? And if so, give me the legal basis.
>
> [Defense counsel]: I object to her [Payne's] statements on there as far as 701 and 702.
>
> THE COURT: Thank you. The objection will be overruled. [Exhibit] 25 will be received.

At trial then, Ford's objection was to all statements made by Payne to Ford during their jail call on the basis that any or all such statements were a violation of Neb. Rev. Stat. § 27-701 or § 27-702 (Reissue 2016).

Section 27-701 provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Section 27-702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

We have not reproduced here the full transcript of the short 3-minute jail call between Payne and Ford that is at issue. Suffice it to say that during the call, Payne referenced that there was evidence that was consistent with a shaken child here and that she wanted to know whether Ford did abuse Skyler so that medical personnel could be in a better position to help Skyler. Ford then responded to Payne's specific questions. Ford does not object to his responses to Payne's questions but objects to Payne's portion of the dialogue as being inadmissible under rules 701 and 702.

The Nebraska Supreme court recently addressed a similar issue in *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017). In *Rocha*, the State offered a recorded interview between a police interrogator and the defendant. The defendant objected arguing that allowing the interrogator's commentary was the equivalent of one witness testifying about the credibility of another. After finding that the specific issue was one of first impression, and after reviewing pronouncements on the issue from courts of numerous other jurisdictions, the Nebraska Supreme Court held:

> We find the approach of the Michigan Supreme Court in [*People v.*] *Musser*[, 494 Mich. 337, 835 N.W.2d 319 (2013),] to be the most persuasive. A rule that would render categorically inadmissible all statements by law enforcement in a recorded interview that happened to implicate the defendant's credibility would run the risk of excluding important and necessary context to the defendant's admissible responses. On the other hand, a rule

- 10 -

that categorically allowed all such statements to be admitted would run the risk of allowing the admission of irrelevant and potentially unfair prejudicial statements. The approach articulated in *Musser* avoids both of these pitfalls. It also has the added virtue of not creating any new evidentiary rules, but, rather, analyzing these types of statements within the framework of the existing rules of evidence.

We hold that statements by law enforcement officials on the veracity of the defendant or other witnesses, made within a recorded interview played for the jury at trial, are to be analyzed under the ordinary rules of evidence. Such commentary is not admissible to prove the truth of the matter asserted in the commentary. But it may be independently admissible for the purpose of providing necessary context to a defendant's statements in the interview which are themselves admissible. The police commentary must be probative and material in light of that permissible purpose of providing context to the defendant's responses. And even statements that are otherwise admissible may be excluded under rule 403. Upon request, a defendant is entitled to a limiting instruction that such statements are to be considered only for the permissible purpose of providing context to the defendant's statements in the interview.

*State v. Rocha*, 295 Neb. at 740-41, 890 N.W.2d at 199.

Although the specific holding in *Rocha* involves statements made by law enforcement officials in recorded interviews, the same concept applies here. After reviewing the entirety of the short approximately 3-minute call, we hold that Payne's dialogue with Ford was necessary to provide context for Ford's responses. Although a limiting instruction was not necessary because the matter was tried to the court, the court's response to another objection and the offer of proof demonstrates that the court considered Payne's statements from the recording only for contextual purposes. First, as mentioned earlier in this opinion, Ford asked Payne whether "[s]he had a belief of what happened prior to meeting with Sergeant Novotny." The State objected on relevancy grounds and the trial court sustained the objection. This ruling objectively demonstrates that the court would not allow Payne to provide her opinion as to whether or not Ford committed the alleged crime. Second, during the offer of proof, the court stopped Ford's questioning of Payne when he again appeared to venture into the area of eliciting Payne's opinion on Ford's guilt or innocence again demonstrating the irrelevance of her opinion. Further, after reviewing the entirety of the "jail call," we note that there were no statements by Payne in the recorded "jail call" that would amount to opinions as contemplated by rules 701 and 702. Instead, the statements and questions by Payne were inquisitive in nature and offered and considered solely to provide context to Ford's responses. In short, the court did not err in allowing the recorded statement of Payne, offered and received as exhibit 25, on the bases of rules 701 and 702. Ford's claim is without merit.

### 4. INSUFFICIENCY OF EVIDENCE

Next, Ford contends that the evidence was insufficient to support his conviction. He contends that no rational trier of fact could have found him guilty, beyond a reasonable doubt, of the intentional element of child abuse. Specifically, he claims that the district court erred in (a) finding sufficient evidence to support his conviction based upon expert witness testimony; (b) in

finding sufficient evidence to support his conviction given the lack of corroborating evidence to support abusive head trauma; and (c) that the State could not sufficiently account for the earlier brain bleeds and the discrepancy of their expert testimony regarding Skylar's brain bleeds.

As charged in this case, in order to find Ford guilty of child abuse resulting in serious bodily injury, the State was required to prove, beyond a reasonable doubt, that Ford knowingly and intentionally caused or permitted Skylar, a minor child, to be placed in a situation that endangered her life or physical or mental health or was cruelly confined or cruelly punished and resulted in serious bodily injury to Skylar. See § 28-707(1) and (7). In this case, Ford admitted that he caused Skylar's injuries. The only question was whether he had intentionally done so.

As we previously noted earlier, an appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. *State v. Schuller,* 287 Neb. 500, 843 N.W.2d 626 (2014). In making this determination, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. *Id.* Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Here, Ford has consistently maintained that he accidently dropped Skylar, that she hit her head on her crib, and then hit her head on the floor. There is no dispute that Skylar was in Ford's care when she sustained her injuries. The issue is whether Ford caused Skylar's injuries intentionally. Despite Ford's arguments to the contrary, the State adduced proof beyond a reasonable doubt that Ford's actions resulting in Skylar's injuries were committed intentionally.

There is no question that on August 3, 2017, Skylar suffered a combination of devastating injuries: subdural hemorrhaging including a midline hemorrhage, retinal hemorrhaging in both eyes, and a global brain injury caused by a lack of oxygen and blood to the brain. The State's medical experts, Drs. Norton, Haney, and Poage, all testified that Skylar's injuries could not have been caused accidentally in the manner described by Ford. Both Drs. Norton and Haney opined, within a reasonable degree of medical certainty, that the cause of Skyler's injuries was abusive head trauma. Even Ford's two experts admitted that Skylar's injuries could have been inflicted intentionally.

We further reject Ford's claim that the evidence was insufficient to support his convictions because "the State's exerts disagreed initially on how many events were presented on the radiology." Brief for appellant at 27. Even though Poage testified that Skylar's radiology images showed earlier brain bleeds, his testimony was also very clear that Skylar could have sustained some type of trauma earlier than August 3, but was not symptomatic. The evidence established that, prior to the August 3, 2017, incident, Skylar was developing normally and had only minor health issues. The evidence established that Skyler was in Ford's care on August 3 when she suffered a serious brain injury. Multiple doctors testified that Skyler's injuries could not have been caused by an accident in the manner claimed by Ford and that the cause of her injuries was abusive head trauma. When viewed in the light most favorable to the State, we find the evidence supports Ford's conviction, that is, that Ford knowingly and intentionally caused or permitted 7-week-old

- 12 -

Skylar to be placed in a situation that endangered her life or physical or mental health or was cruelly confined or cruelly punished and resulted in serious bodily injury to her.

### 5. EXCESSIVE SENTENCE

Ford contends that the sentence imposed was excessive. Ford was convicted of child abuse resulting in serious bodily injury, a Class II felony. See § 28-707(1) and (7). The sentence imposed of 10 to 20 years' imprisonment is within the statutory sentencing range of 1 to 50 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Reissue 2016).

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Tucker*, 301 Neb. 856, 920 N.W.2d 680 (2018); *State v. Russell*, 299 Neb. 483, 908 N.W.2d 669 (2018). Relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Tucker, supra*; *State v. Steele*, 300 Neb. 617, 915 N.W.2d 560 (2018).

At the time the presentence investigation report was prepared, Ford was 23 years old, single, with two dependents. Ford earned a GED and was unemployed at the time of the incident. The probation officer conducting the presentence investigation interview noted that Ford

> repeated numerous times that this situation was an accident and he never meant to harm his daughter. He went on to specifically deny ever shaking her, or throwing her to the table or ground as he reported was mentioned during his trial. He expressed a great deal of remorse for not only his daughter's injuries, but the predicament he has now left his girlfriend and her children in.

Ford has a minimal criminal history with a misdemeanor conviction for third degree assault and minor in possession for which he was sentenced to probation. However, only 5 days into his term of probation, he was convicted of assault which ultimately led to his probation being revoked and him being resentenced to 120 days in jail. Although Ford's criminal history is minimal, two out of his previous three convictions have involved the injury of others through his actions. During Ford's incarceration at the Douglas County Correctional Center awaiting trial in this matter, he has incurred four disciplinary lockdown penalties between January 28 and March 22, 2018, for issues related to refusing housing, threatening an inmate, contraband possession, and tattooing activities. Ford's counsel pointed out that other inmates at the DCCC have been targeting Ford due to the charges he was facing and that Ford has been forced to defend himself. Additionally, Ford's score on the level of service/case management inventory placed him in the high risk category to reoffend.

Ford indicated that he has had experiences with marijuana, cocaine, methamphetamine, mushrooms, heroin, acid, and during the previous year, he had been abusing prescription pills. He further acknowledged that his substance abuse patterns had negatively affected his life including contributing to him being shot and stabbed, contributed to relationship issues with his family, and his prior association "with a negative caliber of individuals." Ford scored in the maximum problem risk area for drugs on the Substance Abuse Questionnaire which indicates "that drug abuse is evident, and [Ford] should be considered to have a serious drug problem." Ford also reported that he has been diagnosed with depression, bipolar disorder, and a personality disorder and he further appears to have documented anger management difficulties. Ford further reported that he suffered "a traumatic brain injury while in the military after a fellow soldier committed suicide with a grenade [while in] his vicinity." He reported that his step-father had been "very physically and mentally abusive towards him," and that he has had two failed suicide attempts, but denied ever spending time in a psychiatric facility. Ford also believes that he suffers from post-traumatic stress disorder due to witnessing the aforementioned suicide of a fellow soldier. Despite acknowledging his mental health issues, Ford related that he was inconsistent in taking his medication for his mental health afflictions prior to his latest incarceration.

Based upon the facts that the sentence imposed was within the statutory sentencing range, the seriousness of the offense, Ford's likelihood to reoffend, his criminal history, that a lesser sentence would depreciate the seriousness of the offense and promote disrespect for the law, the sentence imposed was not an abuse of discretion.

## VI. CONCLUSION

Having considered and rejected Ford's assignments of error, we affirm his conviction and sentence.

AFFIRMED.